IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-180

No. COA20-680

Filed 4 May 2021

Wake County, No. 20CRS1056

STATE OF NORTH CAROLINA

v.

PHILIP BRANDON DAW, Defendant.

Appeal by Defendant from an order entered on 15 June 2020 by Judge Craig Croom in Wake County Superior Court. Heard in the Court of Appeals 9 February 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Joseph L. Hyde, for the State.*

*Tin Fulton Walker & Owen, PLLC, by Jim Melo, and Goodman, Carr, Laughrun, Levine & Green, by W. Rob Heroy, for the Petitioner.*

*Erwin Byrd for Amicus Curiae North Carolina Advocates for Justice.*

JACKSON, Judge.

¶ 1      Under review is the trial court's summary denial of a petition for habeas corpus. Phillip Brandon Daw ("Petitioner") alleges in his petition for habeas corpus that under N.C. Gen. Stat. § 17-33(2), because of an "act, omission or event, which has taken place after[] [his imprisonment], [] [he] has become entitled to be discharged." N.C. Gen. Stat. § 17-33(2) (2019). While there is no appeal of right from

the denial of a petition for habeas corpus, *Chavez v. McFadden*, 374 N.C. 458, 470, 843 S.E.2d 139, 148 (2020), we granted a petition for certiorari filed by Petitioner to review the trial court's order. After careful review, we affirm the order of the trial court.

## I. Background

On 1 May 2019, a Lenoir County grand jury indicted Petitioner with three felony counts of obtaining property by false pretenses. Petitioner pleaded not guilty to these charges. A jury convicted him of all three counts on 24 September 2019 in Lenoir County Superior Court. The trial court sentenced Petitioner to seven to 18 months in prison for each count and ordered that the sentences run consecutively.

Petitioner was then indicted again on two felony counts of obtaining property by false pretenses on 22 October 2018. On 26 November 2018, he was indicted on another felony count of obtaining property by false pretenses. On 10 December 2018, he was indicted on yet another felony count of obtaining property by false pretenses. He pleaded guilty to these new charges and was sentenced to six to 17 months in prison for the three counts from the October and December indictments, with the sentence to run concurrently with his sentence for the three charges of which he was convicted by the Lenoir County jury. Petitioner was sentenced to another concurrent sentence of eight to 19 months for the count from the November indictment.

In March of 2020, the World Health Organization declared that the spread of

the novel coronavirus known as COVID-19 had reached pandemic proportions.[1]  In what would be the first of many executive orders related to COVID-19, our Governor declared a state of emergency, taking numerous steps to coordinate a governmental response and limit the spread of the virus.  *See* Exec. Order No. 116 (2020).  As the first recital of that executive order states, "COVID-19 is a respiratory disease that can result in serious illness or death by the SARS-CoV-2 virus, . . . a new strain of coronavirus[.]" *Id.*

¶ 5        Petitioner was serving his sentence in prison at that time.  In the earlier part of the month, he was serving his sentence at the Craven Correctional Institution, in Craven County, North Carolina.  He was then transferred to Harnett Correctional Institution in Harnett County on 24 March 2020.

¶ 6        The North Carolina Department of Public Safety ("DPS") is the agency that administers prisons in our state.  *See* N.C. Gen. Stat. § 148-4 (2019).  The principal executive officer of that agency is the Secretary.  *See id.*  Under N.C. Gen. Stat. § 148-4, the Secretary of DPS is authorized to "extend the limits of the place of confinement of a prisoner, . . . [to] [p]articipate in community-based programs of rehabilitation, . . . and other programs determined by the Secretary . . . to be consistent with the

---

[1] *See WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 - 11 March 2020*, World Health Organization, https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited March 18, 2021).

prisoner's rehabilitation and return to society[.]" *Id.* On 13 April 2020, the Secretary of DPS announced that he was invoking this statutory authority to "extend the limits of confinement [] of incarcerated persons[,] allowing certain individuals to continue serving their sentence outside of a DPS prison facility, but under the supervision of community correction officers."

¶ 7 By the summer of 2020, the pandemic had worsened.[2] News of it had also become more widespread.[3] On 15 June 2020, Petitioner filed a petition for habeas corpus in Wake County Superior Court alleging that his continued imprisonment during the pandemic violated the guarantee against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution and the guarantee against cruel or unusual punishment in Article 1, § 27 of the North Carolina Constitution. The trial court summarily denied the petition the same day.

¶ 8 Petitioner filed a petition for a writ of certiorari to review the trial court's summary denial of his petition for habeas corpus on 16 June 2020. It was granted by

---

[2] *Daily Updates of Totals by Week and State, COVID-19 Data from the National Center for Health Statistics*, Centers for Disease Control and Prevention, https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm (last visited March 19, 2021).

[3] *See, e.g., As New Coronavirus Cases Hit Another Record in the U.S., Some States Delay Reopenings*, The New York Times (June 25, 2020), https://www.nytimes.com/2020/06/25/world/coronavirus-updates.html (last visited March 19, 2020) ("The United States on Thursday reported more than 41,000 new coronavirus cases, a record total for the second straight day, as a nationwide sense of urgency grew and caseloads soared in Southern and Western states that were far removed from the worst early outbreaks.").

our Court on 9 July 2020. Petitioner then filed a motion for a peremptory setting of the case on 16 December 2020. That motion was also granted by our Court on 17 December 2020.

¶ 9        As noted above, oral argument in this case was heard on 9 February 2021. Six days later, Petitioner was released from prison.[4] He is now serving the remainder of his sentence outside of prison under the Extended Limits of Confinement Program instituted by DPS due to COVID-19.

## II.        Jurisdiction

¶ 10        Our Supreme Court has held that "[p]roceedings in *habeas corpus*, the object of which is to release a person from illegal restraint, must necessarily be summary to be useful, and if action could be arrested by an appeal upon the part of the State, the great writ of liberty would be deprived of its most beneficial results." *In re Williams*, 149 N.C. 436, 437, 63 S.E. 108, 109 (1908). Thus, while "no appeal as of right lies from an order entered in a habeas corpus proceeding, appellate review of such orders is available 'by petition for certiorari addressed to the sound discretion of the appropriate appellate court.'" *Chavez*, 374 N.C. at 470, 843 S.E.2d at 148 (quoting *State v. Niccum*, 293 N.C. 276, 278, 238 S.E.2d 141, 143 (1977)). "Such a petition

---

[4] Under North Carolina Rule of Evidence 201, we take judicial notice of this fact from the Department of Public Safety website's offender search results. *See* N.C. Gen. Stat. § 8C-1, Rule 201 (2019). *See, e.g.*, *State v. Harwood*, 243 N.C. App. 425, 427 n.2, 777 S.E.2d 116, 118 n.2 (2015) (taking judicial notice of same).

should be filed with the clerk of the appellate court to which an appeal of right might have been taken from the judgment imposing the sentence which is the subject of inquiry in the habeas corpus proceeding." *Niccum*, 293 N.C. at 278, 238 S.E.2d at 143. In capital cases, the appropriate appellate court is the Supreme Court. N.C. R. App. P. 21(e). "In all other cases such petitions shall be filed in and determined by the Court of Appeals[.]" *Id.*

¶ 11     As noted above, Petitioner filed his petition for habeas corpus in Wake County Superior Court on 15 June 2020 and the trial court denied it the same day. The next day, Petitioner filed a petition for writ of certiorari with our Court requesting review of the trial court's denial of his petition for habeas corpus. We granted the petition for certiorari. The trial court's order summarily denying the petition for habeas corpus is therefore properly before us.

### III.     Mootness

¶ 12     Petitioner has been released from prison and is now serving the remainder of his sentence in the community. Petitioner has therefore received the relief requested in his petition and this case is moot.

¶ 13     Generally speaking,

> North Carolina appellate courts do not decide moot cases. A case is "moot" when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy. In state courts the exclusion of moot questions from determination is not

> based on a lack of jurisdiction but rather represents a form of judicial restraint. Our purpose in exercising such restraint is to ensure that this Court does not determine matters purely speculative, enter anticipatory judgments, declare social status, deal with theoretical problems, give advisory opinions, answer moot questions, adjudicate academic matters, provide for contingencies which may hereafter arise, or give abstract opinions. As a general proposition, cases that have become moot should be dismissed.

*Chavez*, 374 N.C. at 467, 843 S.E.2d at 146-47 (internal marks and citation omitted).

¶ 14    However, "[t]he mootness doctrine is subject to exceptions, including the public interest exception, . . . and the 'capable of repetition, yet evading review' exception[.]'" *Id.,* 843 S.E.2d at 147. "Under the 'public interest' exception to mootness, an appellate court may consider a case, even if technically moot, if it involves a matter of public interest, is of general importance, and deserves prompt resolution." *Chavez v. Carmichael*, 262 N.C. App. 196, 203, 822 S.E.2d 131, 137 (2018) ("*Carmichael*") (internal marks and citation omitted), *vacated and reversed in part on other grounds sub nom. Chavez v. McFadden*, 374 N.C. 458, 843 S.E.2d 139 (2020). "Our appellate courts have previously applied the 'public interest' exception to otherwise moot cases of clear and far-reaching significance, for members of the public beyond just the parties in the immediate case." *Id.* at 203-04, 822 S.E.2d at 137 (citation omitted).

¶ 15    On the other hand,

> [a] case is "capable of repetition, yet evading review," when the underlying conduct upon which the relevant claim rests

> is necessarily of such limited duration that the relevant claim cannot be fully litigated prior to its cessation and the same complaining party is likely to be subject to the same allegedly unlawful action in the future.

*Chavez*, 374 N.C. at 467-68, 843 S.E.2d at 147 (citation omitted). In the habeas context, "the 'capable of repetition, yet evading review' exception to the mootness doctrine is technically not available in . . . the absence of any indication that [the] petitioner[] [is] likely to find themselves in the same situation . . . in the future[.]" *Id.* at 468-69, 843 S.E.2d at 147-48.

At oral argument, counsel for Petitioner argued that the public interest exception to the mootness doctrine should apply in this case, if Petitioner were to be released from prison after oral argument but before we were able to issue an opinion. Petitioner was then released from Harnett County Correctional Institution to serve the remainder of his sentence in the community six days later.

We agree with Petitioner that the public interest exception to the mootness doctrine applies here. There are a number of petitions pending with our Court that have been held in abeyance until we issue an opinion in this case. Resolution of the questions presented by this appeal on the merits would therefore clearly affect "members of the public beyond just the parties in the immediate case." *Carmichael*, 262 N.C. App. at 203-04, 822 S.E.2d at 137. Accordingly, we hold that the public interest exception applies and will proceed to address the merits of the case.

#### IV. Standard of Review

¶ 18 "The decision concerning whether an application for a writ of habeas corpus should be summarily denied or whether additional proceedings should be conducted based upon the issuance of the requested writ is . . . a pure question of law." *State v. Leach*, 227 N.C. App. 399, 407, 742 S.E.2d 608, 613, *disc. rev. denied*, 372 N.C. 222, 747 S.E.2d 543 (2013). Accordingly, our review of the trial court's denial of a petition for habeas corpus is *de novo*. *Id.* "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (internal marks and citation omitted).

#### V. Summary Denial of a Petition for Habeas Corpus Alleging that an "Act, Omission, or Event" Has Occurred Entitling the Party to Discharge

¶ 19 This case presents the question of whether a trial court errs when it summarily denies a petition for habeas corpus when the petition alleges that an "act, omission, or event" has occurred that entitles an incarcerated person to be discharged from custody. We hold that summary denial of such a petition is permissible, and that the trial court did not err in summarily denying the petition for habeas corpus in this case.

¶ 20 Our consideration of this question proceeds in four parts. First, we review the origins, evolution, and limits of the writ of habeas corpus under North Carolina law.

Second, we parse the language of the statutory scheme governing petitions for habeas corpus in our General Statutes. Third, we review the trial court's order, which summarily denied the habeas petition without expressly stating whether an evidentiary proceeding was necessary.[5] Fourth, we turn to this question, and hold that the allegations in the petition and materials submitted in support thereof did not require the trial court to conduct an evidentiary hearing. As discussed in further detail *infra*, the allegations in the petition and the accompanying affidavits and materials did not create a forecast of admissible evidence individualized to the specific circumstances of Petitioner's case that an "act, omission, or event" had occurred that entitled Petitioner to be discharged. For this reason, we hold that summary denial of the petition was proper. Accordingly, we affirm the order of the

---

[5] The trial court's summary denial of the petition is itself an implicit resolution of this issue, of course. The absence of an express resolution of the issue in the order also is not entirely surprising. In the section of the current version of the *North Carolina Superior Court Judges' Benchbook* related to habeas corpus, only the general rule cited by the trial court in its order—N.C. Gen. Stat. § 17-4—is mentioned. *See* Jessica Smith, *Habeas Corpus* 3 (Mar. 2014), *in* North Carolina Superior Court Judges' Benchbook (noting that a petition for habeas corpus should be summarily denied when the court determines that the party is imprisoned "by virtue of a final order, judgment, or decree of a competent tribunal, or by virtue of an execution issued upon such final order, judgment or decree") (quoting N.C. Gen. Stat. § 17-4). The publisher of the *Benchbook* recently issued a bulletin noting several "well-recognized exceptions to [this] general rule[,]" including N.C. Gen. Stat. § 17-33(2), which provides for discharge "[w]here, . . . by some act, omission or event, . . . [a] party has become entitled to be discharged." *See* Ian A. Mance, "Securing the Release of People in Custody in North Carolina During the COVID-19 Pandemic," UNC School of Government, No. 2020/02 (June 2020) (quoting N.C. Gen. Stat. § 17-33(2)). However, as noted above, this exception is not mentioned in the *Benchbook*.

trial court.

## A. Origins, Evolution, and Limits of the Writ of Habeas Corpus under North Carolina Law

### 1. *Historic Development*

The writ of habeas corpus under North Carolina law originates from the law of England. *In re Bryan*, 60 N.C. 1, 42 (1863). At common law, "every court of record of superior jurisdiction ha[d] power to issue the writ of *habeas corpus*[.]" *Id.* The writ "ar[ose] from the obligation of the king to protect all of his subjects in the enjoyment of their right of personal liberty, and for this purpose to inquire by his courts into the condition of any of his subjects." *Id.* Under English law,

> any person, whether imprisoned on a criminal charge or restrained of his liberty for any other cause, had a right during the sitting of the courts, by application to the court, and during the vacation by application to any one of the judges, to have the cause of his being imprisoned or restrained of his liberty inquired into without delay.

*Id.* at 44.

North Carolina's original habeas corpus act was "taken from [] two English statutes[.]" *Id.* at 43. Like English law, North Carolina's earliest habeas statutes "require[d] . . . any judge of the Supreme or Superior Court . . . to issue the writ of *habeas corpus* on the application of any person imprisoned on a criminal charge or otherwise restrained of his liberty." *Id.* From English law, the common law of North Carolina thus received

> the great Writ of Right, *habeas corpus* to bring any citizen alleged to be wrongfully imprisoned or restrained of his liberty, before the Court, with the cause of his arrest and detention, that the matter may be inquired of and the party set at liberty, if imprisoned against law.

*Id.* at 45. *See also* John V. Orth & Paul Martin Newby, The North Carolina State Constitution 75 (2013) (noting the reception of England's Habeas Corpus Act of 1679 by North Carolina before the adoption of the Constitution of 1776).

¶ 23        The Declaration of Rights of the North Carolina Constitution of 1776 did not expressly reference the writ, *see id.* at 20, but guaranteed the right of "every freeman restrained of his liberty[,] . . . to inquire into the lawfulness thereof, and to remove the same, if unlawful[,]" N.C. Const., Declaration of Rights § 13 (1776). The Constitution of 1868 expanded this guarantee to "every *person* restrained of his liberty[,]" N.C. Const. art. I, § 18 (1868) (emphasis added), and added an express guarantee to the writ for the first time, *id.* § 21 ("The privilege of the writ of habeas corpus shall not be suspended."). These constitutional guarantees were codified in the General Statutes in 1868. *See, e.g.*, *Harkins v. Cathey*, 119 N.C. 650, 664, 26 S.E. 136, 140 (1896) (Avery, J., dissenting) ("[W]hen the Constitution [of 1868] enjoined upon the Legislature the duty of providing a remedy, . . . they passed the statute[.]"); N.C. Gen. Stat. § 17-1 (2019) ("Every person restrained of his liberty is entitled to a remedy to inquire into the lawfulness thereof, and to remove the same, if unlawful; and such remedy ought not to be denied or delayed."). The United States Supreme

Court observed that same year that "[t]he great writ of *habeas corpus* has been for centuries esteemed the best and only sufficient defence of personal freedom." *Ex Parte Yerger*, 75 U.S. 85, 95 (1868) (emphasis in original).

Before the adoption of the Constitution of 1868, the authority of North Carolina courts to issue the writ was understood to be inherent in the judicial power. *See In re Bryan*, 60 N.C. at 43. Our Supreme Court had reasoned that the very

> establishment of a Supreme Court . . . invests it with power to inquire by means of this great Writ of Right . . . and if . . . the Legislature had in express terms denied the Court the power to issue this writ . . . , such prohibition would have been void and of no effect.

*Id. See also id.* at 44-45 ("Suppose, for the sake of argument, it was necessary that the power should be conferred on the Supreme Court by statute[,] we are of opinion that it is conferred by the Act establishing the Court."). After the adoption of the Constitution of 1868, however, this understanding evolved. *In re Schenk*, 74 N.C. 607, 608 (1876) ("The power to issue the writ of *habeas corpus* is derived from the Constitution . . . , and the Act of the Legislature for enforcing that provision[.]"). Thus, though the writ originated from the reception of English law by North Carolina and predates the Constitution of 1776, since the constitutionalization of the writ in 1868 and amendment of the habeas statutes that year, the authority of trial courts to issue the writ has been held to derive from the Constitution and General Statutes. *See id.*

¶ 25    The Declaration of Rights of the North Carolina Constitution of 1971, our current state Constitution, provides that "[e]very person restrained of his liberty is entitled to a remedy to inquire into the lawfulness thereof, and to remove the restraint if unlawful, and that remedy shall not be denied or delayed." N.C. Const. art. I, § 21. Like § 21 of the Constitution of 1868, § 21 of the Constitution of 1971 contains an express guarantee to the writ and against its suspension. *See id.* Thus, Article I, §§ 18 and 21 of the Constitution of 1868 were combined and strengthened in Article I, § 21 of the Constitution of 1971, replacing "the frequently used subjunctive mood . . . [with] the imperative . . . to make clear that the provisions . . . are commands and not mere admonitions." John L. Sanders, *The Constitutional Development of North Carolina, in* North Carolina Government 1585-1974: A Narrative and Statistical History 803 (John L. Cheney, Jr., ed. 1975).[6]

¶ 26    The scope of habeas corpus jurisdiction has also evolved. "Traditionally, the writ of habeas corpus was thought to issue only to ascertain whether the court which imprisoned the person seeking the relief had jurisdiction of the matter or whether the

---

[6] *Compare* N.C. Const. art. I, § 18 (1868) ("Every person restrained of his liberty, is entitled to a remedy to enquire into the lawfulness thereof and to remove the same, if unlawful, and such remedy ought not be denied or delayed.") *with* N.C. Const. art. I, § 21 (1971) ("Every person restrained of his liberty is entitled to a remedy to inquire into the lawfulness thereof, and to remove the restraint if unlawful, and that remedy *shall* not be denied or delayed.") (emphasis added). Section 21 of the Constitution of 1971 is codified at N.C. Gen. Stat. §§ 17-1, -2. *Hoffman v. Edwards*, 48 N.C. App. 559, 561, 269 S.E.2d 311, 312 (1980).

court had exceeded its power." *Hoffman v. Edwards*, 48 N.C. App. 559, 561-62, 269 S.E.2d 311, 312 (1980) (citation omitted). However, through the enactment of N.C. Gen. Stat. § 17-33(2), our General Assembly expanded "the scope of a court's habeas corpus jurisdiction to include those instances '[w]here, though the original imprisonment was lawful, yet by some act, omission or event, which has taken place afterwards, the party has become entitled to be discharged.'" *In re Stevens*, 28 N.C. App. 471, 474, 221 S.E.2d 839, 840 (1976) (quoting N.C. Gen. Stat. § 17-33(2)). Thus, while "at common law, [the writ] was not thought to issue to review all deprivations of liberty[,]" *Hoffman*, 48 N.C. App. at 563, 221 S.E.2d at 313, "it is clear now that the scope of a court's habeas corpus jurisdiction is much broader[,]" *id.* at 562, 221 S.E.2d at 312. *See also id.* at 563, 221 S.E.2d at 313 ("It is only through legislative grace that the remedy has been extended.").

¶ 27    However, "[t]hough obviously essential to the maintenance of civil liberty, the writ is not unlimited in its jurisdictional scope, utility and function." *In re Stevens*, 28 N.C. App. at 473, 221 S.E.2d at 840. It is not "allowed as a substitute for an appeal, and where an appeal lies, such course should be pursued." *In re Coston*, 187 N.C. 509, 512, 122 S.E. 183, 185 (1924). Moreover, "[w]hen the legislature has provided an effective administrative remedy, it is exclusive[,] . . . and [a] party . . . [must] exhaust his administrative remedies before resorting to the courts." *Hoffman*, 48 N.C. App. at 563, 269 S.E.2d at 313 (internal marks and citation omitted). N.C. Gen.

Stat. § 148-11 specifically authorizes the Secretary of DPS to "adopt rules for the government of the State prison system[,]" including "rules that pertain to enforcing discipline[,]" N.C. Gen. Stat. § 148-11(a) (2019), and we have held that generally speaking, issues such as a prisoner's "grade of conduct, privileges, disciplinary action and commendations are strictly administrative and not judicial matters[,]" *In re Stevens*, 28 N.C. App. at 474, 221 S.E.2d at 841 (internal marks and citation omitted). In other words,

> the difficult problems of when a person should be released and under what circumstances turn on analysis of internal correctional policy, and rightfully lie within the sole administrative jurisdiction of our State governmental departments, and are not, barring a clear instance of constitutional infirmity, subjects appropriate for judicial scrutiny.

*Id.* (citation omitted).

### 2. *Modern Development:* **State v. Leach**

No discussion of the origins and evolution of the writ of habeas corpus under North Carolina law would be complete if it did not include *State v. Leach*, 227 N.C. App. 399, 742 S.E.2d 608 (2013), our Court's most significant recent decision on the subject. *Leach* involved a prisoner who was denied parole after entering into an agreement under the Mutual Agreement Parole Program ("MAPP") and working on work release under the terms of the agreement for over a year. *Id.* at 401, 742 S.E.2d at 609-10. After the prisoner had performed substantially under the MAPP contract,

the Parole Commission notified him that it was terminating the contract and denying his parole based on "a substantial risk . . . [he] would not conform to reasonable conditions of parole and would engage in further criminal conduct." *Id.* at 401, 742 S.E.2d at 610 (internal marks omitted).

¶ 29 The prisoner thereafter filed a grievance challenging the termination of the contract and the denial of his parole but was unsuccessful. *Id.* He then petitioned the Moore County Superior Court for issuance of a writ of habeas corpus, alleging that the termination of the contract and denial of his parole violated his rights to due process and to be free from retroactive application of the criminal law. *Id.* at 401, 409, 742 S.E.2d at 610, 614. The trial court, like the trial court in this case, summarily denied the petition, citing N.C. Gen. Stat. § 17-4(2).[7] *Id.* at 401, 742 S.E.2d at 610.

¶ 30 Mr. Leach then petitioned our Court for certiorari to review the trial court's summary denial of his petition for habeas corpus, which we granted. *Id.* at 402, 742 S.E.2d at 610. After reviewing the relevant statutory provisions, we began our discussion with the observation that "[t]he summary nature of the proceedings to be

[7] This subsection provides the general rule referenced in the previous footnote, that a petition for habeas corpus is subject to summary denial if the party is "committed or detained by virtue of the final order, judgment or decree of a competent tribunal of civil or criminal jurisdiction, or by virtue of an execution issued upon such final order, judgment or decree." N.C. Gen. Stat. § 17-4(2) (2019).

conducted following the return of a writ of habeas corpus reflects the fact that 'their principal object [is] a release of a party from illegal restraint' and that such proceedings would 'lose many of their most beneficial results' if they were not 'summary and prompt.'" *Id.* at 404, 742 S.E.2d at 612 (quoting *State v. Miller*, 97 N.C. 451, 454, 1 S.E. 776, 778 (1887)).

¶ 31    "However," we reasoned, "the resulting proceedings should not be 'perfunctory and merely formal'; instead, relevant facts, 'when controverted, may be established by evidence like any other disputed fact.'" *Id.* (quoting *In re Bailey*, 203 N.C. 362, 365-66, 166 S.E. 165, 166 (1932)). We also noted that "[t]he statutory provisions governing habeas corpus proceedings contain no indication that a trial judge must make findings of fact and conclusions of law in the course of determining whether an application for the issuance of a writ of habeas corpus should be summarily denied[,]" explaining that the "purpose sought to be achieved by requiring a trial court to make specific findings of fact and conclusions of law is to enable a reviewing court to determine the legal and factual basis for the trial court's decision." *Id.* at 405-06, 742 S.E.2d at 612-13 (citation omitted). We held that the trial court's determination of whether to summarily deny a petition for habeas corpus or conduct an evidentiary hearing on the petition must be based on "the face of the applicant's application, including any supporting documentation," and nothing more, and that in a summary denial of a petition for habeas corpus, no findings of fact or conclusions of law are

required. *Id.* at 406-07, 742 S.E.2d at 613.

¶ 32 On the merits, we affirmed the trial court's summary denial of the petition, but

for a different reason than the one given by the trial court. *Id.* at 413-15, 742 S.E.2d

at 617-19. We noted at the outset of our merits discussion that

> [a]s a result of the fact that habeas corpus is available in
> instances in which, "though the original imprisonment was
> lawful, yet by some act, omission or event, which has taken
> place afterwards, the party has become entitled to be
> discharged," N.C. Gen. Stat. § 17-33(2), the extent to which
> an imprisoned individual is entitled to challenge parole-
> related decisions by means of an application for the
> issuance of a writ of habeas corpus has been the subject of
> litigation before this Court on a number of occasions.

*Id.* at 409, 742 S.E.2d at 615. We also reiterated that "habeas corpus relief is not

available in connection with an incarcerated individual's challenge to an

administrative decision, . . . unless the inmate has exhausted any available

administrative remedies and unless some clear constitutional violation has occurred."

*Id.* at 411, 742 S.E.2d at 616.

¶ 33 We went on to affirm the trial court's summary denial of the petition because

Mr. Leach had failed to make a threshold showing in his application that a material

issue of fact existed as to whether an "act, omission, or event" had occurred entitling

him to discharge. *See id.* at 413-15, 742 S.E.2d at 617-19. Although Mr. Leach had

*argued* he had fully performed under the terms of the MAPP contract, we were unable

to evaluate this argument based on the petition and materials submitted in support

thereof because a full copy of the MAPP contract had not been included. *Id.* 413-14, 742 S.E.2d at 617-18. Thus, while Mr. Leach had appropriately exhausted his available administrative remedies, *id.* at 411, 742 S.E.2d at 616, we ultimately concluded that he had not provided the forecast of admissible evidence necessary to demonstrate an evidentiary hearing on his constitutional claims was required, *see id.* at 414, 742 S.E.2d at 618. Accordingly, we affirmed the order of the trial court, although not on the original basis cited in the trial court's order—N.C. Gen. Stat. § 17-4(2).

### 3. *The State's Argument Based on the Plain Language of N.C. Gen. Stat. § 17-33*

¶ 34        *Leach* is directly relevant to the State's primary argument in this case. Specifically, the State's argument here is based on a reference in N.C. Gen. Stat. § 17-33 to "civil process." The statute provides in relevant part that

> if it appears on the return to the writ that the party is in custody by virtue of *civil process* from any court legally constituted, or issued by any officer in the course of judicial proceedings before him, authorized by law, such party can be discharged only in one of the following cases:
>
> . . .
>
> (2)    Where, though the original imprisonment was lawful, yet by some act, omission or event, which has taken place afterwards, the party has become entitled to be discharged.

N.C. Gen. Stat. § 17-33 (2019) (emphasis added).

The State argues that the reference to "civil process" in N.C. Gen. Stat. § 17-33 means that the statute does not apply to individuals who are imprisoned because of a conviction and sentence imposed for a violation of the criminal law. We disagree, and reject the State's argument for three reasons: (1) it is contrary to our decision in *Leach*; (2) it is inconsistent with the language of § 17-33; and (3) it ignores the historic development of the writ of habeas corpus and the intent of the General Assembly expressed in § 17-33.

The State made a similar argument in *Leach* to the one it now makes. There, the State had suggested that we decline to follow *Hoffman* and disavow our observation that N.C. Gen. Stat. § 17-33(2) "allow[s] an incarcerated individual to obtain discharge despite having originally been imprisoned pursuant to a valid judgment." 227 N.C. App. at 410 n.4, 742 S.E.2d at 615, n.4. We rejected this argument and instead concluded that "we lack[ed] the authority to act on [the State's] suggestion[,]" *id.*, citing our Supreme Court's holding in *In re Civil Penalty*, 324 N.C. 373, 379 S.E.2d 30 (1989). *See id.* at 384, 379 S.E.2d at 37 ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court.").

While the State's argument here is not the same argument that we expressly rejected in *Leach*, our holding in *Leach* requires us to reject it here. Accepting the

State's argument that N.C. Gen. Stat. § 17-33 does not apply in criminal cases because the statute contains a reference to "civil process" would require us to overrule our decisions in *Leach*, *In re Stevens*, and *Hoffman*. *See Leach*, 227 N.C. App. at 409, 742 S.E.2d at 615 (noting "the fact that habeas corpus is available in instances in which, 'though the original imprisonment was lawful, yet by some act, omission or event, . . . the party has become entitled to be discharged'"); *In re Stevens*, 28 N.C. App. at 474, 221 S.E.2d at 840 (same); *Hoffman*, 48 N.C. App. at 562, 269 S.E.2d at 312 ("Whatever the case may have been, it is clear now that the scope of a court's habeas corpus jurisdiction is much broader [than at common law.]"). This is something we cannot do. *In re Civil Penalty*, 324 N.C. at 384, 379 S.E.2d at 37.

¶ 38        The State's argument is also inconsistent with the language of § 17-33. As Petitioner's counsel pointed out at oral argument, acceptance of the State's argument based on the reference to civil process in § 17-33 would require us to ignore the second clause of the same sentence of the statute, which disjunctively provides for issuance of the writ in the alternative "by any officer in the course of judicial proceedings before him[.]" N.C. Gen. Stat. § 17-33 (2019). It is axiomatic that "[a]ll parts of the same statute dealing with the same subject are to be construed together as a whole, and every part thereof must be given effect if this can be done by any fair and reasonable interpretation." *State v. Tew*, 326 N.C. 732, 739, 392 S.E.2d 603, 607 (1990) (citation omitted). We have even made this observation specifically in the habeas context.

*Hoffman*, 48 N.C. App. at 564, 269 S.E.2d at 313 ("Statutes dealing with the same subject matter must be construed in pari materia, and harmonized, if possible, to give effect to each."). Consequently, "a provision will not be read in a way that renders another provision of the same statute meaningless." *Brown v. Brown*, 112 N.C. App. 15, 21, 434 S.E.2d 873, 878 (1993) (citation omitted).

¶ 39          Finally, the State's argument ignores the historic development of the writ and the intent of the General Assembly reflected in § 17-33. We must be mindful of the longstanding "presumption [] that the legislature was fully cognizant of prior and existing law within the subject matter of its enactment." *Biddix v. Henredon Furniture Indus., Inc.*, 76 N.C. App. 30, 34, 331 S.E.2d 717, 720 (1985) (citation omitted). We must presume that the General Assembly of 1868—the same General Assembly that drafted and approved the Constitution of 1868 before it was ratified by a popular vote in April of that year, *see* Sanders, *supra* at 796—was aware of the ancient origins of the writ and North Carolina's reception of the English Habeas Corpus Act of 1679 before the adoption of the Constitution of 1776, and further, that our Supreme Court at that time believed the General Assembly lacked the authority to deprive the Court of jurisdiction over the writ. With this knowledge, the General Assembly of 1868 made two important choices: (1) to constitutionalize the writ and a guarantee against its suspension in §§ 18 and 21 of the Constitution of 1868; and (2) to broaden the scope of habeas corpus jurisdiction from its origins at common law

by enacting § 17-33. Setting aside our Court's own precedent requiring us to reject the State's argument about the applicability of § 17-33 in criminal cases, we cannot ignore these legislative choices.

¶ 40        Moreover, decisions by our Supreme Court contemporaneous with the enactment of § 17-33 do not support reading the reference to civil process in the statute to refer to civil as opposed to criminal litigation. Instead, the principle reflected in the statutory reference to civil process is that the writ of habeas corpus is a feature of civil government, and specifically, a feature of the civilian rather than military system of justice. Several years before the statute or the Constitution of 1868 were adopted, during the Civil War, our Supreme Court confirmed this principle by denying petitions for habeas corpus by Confederate soldiers awaiting trial by Confederate courts martial. *Cox v. Gee*, 2 Win. 131, 132 (1864). As the Court observed in *Cox*, "[a] soldier, bound to service in the army, when once enrolled and assigned his post of duty, is in military custody, and no longer at liberty to go about at will." *Id.* "Legitimate inquiry in such cases goes only to the extent of ascertaining whether the prisoner is rightfully in the army[,]" the Court held. *Id.* at 133. The year before, the Court had confirmed the converse: "the Court . . . ha[d] jurisdiction . . . to discharge [a] *citizen* whenever it appear[ed] that he [was] unlawfully restrained of his liberty by an officer of the Confederate States." *In re Bryan*, 60 N.C. at 19 (emphasis added). Likewise, two years after the adoption of the Constitution of 1868

and the enactment of § 17-33, the Court held that a military officer detaining a civilian could not lawfully ignore the command of a writ of habeas corpus issued by a civilian court. *In re Moore*, 64 N.C. 802, 808-10 (1870).

¶ 41 *Cox*, *In re Bryan*, and *In re Moore* demonstrate that the reference in § 17-33 to civil process codified a distinction between civil and *military* systems of justice rather than civil and *criminal* litigation. We therefore do not construe the reference in § 17-33 to "civil process" to mean the statute is inapplicable to people who are imprisoned after being convicted and sentenced for violations of the criminal law. Accordingly, we reiterate our holding in *Leach* that an incarcerated person may petition for issuance of a writ of habeas corpus under § 17-33(2) based on the occurrence of an "act, omission, or event" entitling the party to discharge, even though the writ would not have issued in such cases at common law. *See* 227 N.C. App. at 410 n.4, 742 S.E.2d at 615 n.4.

## B. The Statutory Scheme Governing Writs of Habeas Corpus

¶ 42 Chapter 17 of the General Statutes contains the habeas statutes. Section 17-3 provides:

> [e]very person imprisoned or restrained of his liberty within this State, for any criminal or supposed criminal matter, or on any pretense whatsoever, except in cases specified in G.S. 17-4, may prosecute a writ of habeas corpus, according to the provisions of this Chapter, to inquire into the cause of such imprisonment or restraint, and, if illegal, to be delivered therefrom.

N.C. Gen. Stat. § 17-3 (2019).[8]

The petition may be made by a party or any person on behalf of a party, *id.* § 17-5, and may be directed to any superior or appellate court judge, *id.* § 17-6. It "must allege . . . that the party 'is imprisoned or restrained of his liberty,' the location of the party's imprisonment, the person restraining the imprisoned party, '[t]he cause or pretense of such imprisonment or restraint,' and [include] [] supporting documents." *Chavez*, 374 N.C. at 469, 843 S.E.2d at 148 (quoting N.C. Gen. Stat. § 17-7(1)-(3)).

If the petition has merit, the judge to whom it is presented "shall grant the writ without delay," N.C. Gen. Stat. § 17-9 (2019); however, the petition must be denied if "it appear[s] from the application itself or from the documents annexed that the person applying or for whose benefit it is intended is . . . prohibited from prosecuting the writ." *Id.* The court's determination whether to grant or deny the petition must be based on "the face of the applicant's application, including any supporting documentation[.]" *Leach*, 227 N.C. App. at 406, 742 S.E.2d at 613. Accordingly, "the reviewing judge must determine if the application, on its face,

---

[8] Scholarly commentators have noted that "[t]he word chosen, 'restraint,' is intentionally comprehensive and includes all sorts of confinement, not limited to jails and prisons." Orth & Newby, *supra* at 75. "The remedy to which everyone is entitled, although somewhat obscured by the punctuation, is twofold: to inquire into the lawfulness of the restraint and to remove it if unlawful." *Id.*

provides a basis for believing that the applicant is, in fact, entitled to be discharged from imprisonment or restraint and must, if it does, issue a writ of habeas corpus." *Id.* at 405, 742 S.E.2d at 612.

¶ 45        If the petition is granted and the writ issues, "[t]he person or officer on whom the writ is served must make a return thereto in writing," either immediately or at the time specified in the writ, N.C. Gen. Stat. §§ 17-14, -13 (2019), "stating whether the individual upon whom the writ is served 'has or has not the party in his custody or under his power or restraint' and, if so, 'the authority and the cause of such imprisonment or restraint[,]' along with any documents supporting the imprisonment or restraint[,]" *Chavez*, 374 N.C. at 470, 843 S.E.2d at 148 (quoting N.C. Gen. Stat. § 17-14(1)-(3)). After the return is made, the judge who issued the writ is required to

> examine into the facts contained in such return, and into the cause of the confinement or restraint of such party, whether the same has been upon commitment for any criminal or supposed criminal matter or not; and *if issue be taken upon the material facts in the return, or other facts are alleged to show that the imprisonment or detention is illegal, or that the party imprisoned is entitled to his discharge*, the court or judge shall proceed, in a summary way, to hear the allegations and proofs on both sides, and to do what to justice appertains in delivering, bailing or remanding such party.

N.C. Gen. Stat. § 17-32 (2019) (emphasis added). Thus, "[a]fter the writ has been served and the custodial officer makes the required return, the trial court must make the factual and legal decisions necessary to determine whether the applicant is, in

fact, lawfully imprisoned or restrained utilizing such procedures as suffice to adequately resolve any relevant issues of law or fact." *Leach*, 227 N.C. App. at 405, 742 S.E.2d at 612.

¶ 46     North Carolina General Statutes §§ 17-33 and -34 respectively govern discharge and remand, possible dispositions after a return of a writ. *See* N.C. Gen. Stat. §§ 17-33, -34 (2019). "A party petitioning for the issuance of a writ of habeas corpus shall be discharged '[i]f no legal cause is shown for such imprisonment or restraint, or for the continuance thereof.'" *Chavez*, 374 N.C. at 469, 843 S.E.2d at 148 (quoting N.C. Gen. Stat. § 17-33). If the petitioner is not successful in obtaining discharge, the party must be remanded to custody. *See* N.C. Gen. Stat. § 17-34 (2019). Section 17-33 provides that discharge is proper in the following circumstances:

> (1)     Where the jurisdiction of such court or officer has been exceeded, either as to matter, place, sum or person.
>
> (2)     *Where, though the original imprisonment was lawful, yet by some act, omission or event, which has taken place afterwards, the party has become entitled to be discharged.*
>
> (3)     Where the process is defective in some matter of substance required by law, rendering such process void.
>
> (4)     Where the process, though in proper form, has been issued in a case not allowed by law.
>
> (5)     Where the person, having the custody of the party under such process, is not the person empowered by law to detain him.

(6)     Where the process is not authorized by any judgment, order or decree of any court, nor by any provision of law.

*Id.* § 17-33 (emphasis added).  Regarding remand, § 17-34 provides:

It is the duty of the court or judge forthwith to remand the party, if it appears that he is detained in custody, either—

(1)     By virtue of process issued by any court or judge of the United States, in a case where such court or judge has exclusive jurisdiction.

(2)     By virtue of the final judgment or decree of any competent court of civil or criminal jurisdiction, or of any execution issued upon such judgment or decree.

(3)     For any contempt specially and plainly charged in the commitment by some court, officer or body having authority to commit for the contempt so charged.

(4)     That the time during which such party may be legally detained has not expired.

*Id.* § 17-34.

¶ 47     A petition may also be summarily denied.  Section 17-4 provides:

Application to prosecute the writ shall be denied in the following cases:

(1)     Where the persons are committed or detained by virtue of process issued by a court of the United States, or a judge thereof, in cases where such courts or judges have exclusive jurisdiction under the laws of the United States, or have acquired exclusive jurisdiction by the commencement of suits in such courts.

(2)     Where persons are committed or detained by virtue of the final order, judgment or decree of a competent

tribunal of civil or criminal jurisdiction, or by virtue of an execution issued upon such final order, judgment or decree.

(3)     Where any person has willfully neglected, for the space of two whole sessions after his imprisonment, to apply for the writ to the superior court of the county in which he may be imprisoned, such person shall not have a habeas corpus in vacation time for his enlargement.

(4)     Where no probable ground for relief is shown in the application.

*Id.* § 17-4.  Largely mirroring the remand statute, § 17-34, § 17-4(2) thus provides the general rule that summary denial of a petition is proper if a party is "committed or detained by virtue of the final order, judgment or decree of a competent tribunal of civil or criminal jurisdiction, or by virtue of an execution issued upon such final order, judgment or decree." *Id.* § 17-4(2).

However, this general rule appears to conflict with § 17-33(2), which appears to require summary denial of a petition where a party is "committed or detained by virtue of the final order, judgment or decree of a competent tribunal of civil or criminal jurisdiction," *id.* § 17-4(2), when remand would be required, *id.* § 17-34(2), while § 17-33 requires discharge rather than remand if, "though the original imprisonment was lawful, yet by some act, omission or event, which has taken place afterwards, the party has become entitled to be discharged[,]" *id.* § 17-33(2).  Reading § 17-4 without reference to § 17-33 could lead a court reviewing a habeas petition to mistakenly conclude that a party "committed or detained by virtue of the final order,

judgment or decree of a competent tribunal of civil or criminal jurisdiction," *id.* § 17-4(2), was "prohibited from prosecuting the writ[,]" *id.* § 17-9, resulting in summary denial of the petition without resolving whether because of "some act, omission or event, . . . the party has become entitled to be discharged[,]" *id.* § 17-33(2), as happened in *Leach*. *See* 227 N.C. App. at 401, 742 S.E.2d at 610. That is also what appears to have happened here.

¶ 49    We have held that these provisions "must be construed in pari materia, and harmonized, if possible, to give effect to each." *Hoffman*, 48 N.C. App. at 564, 269 S.E.2d at 313. "It is a canon of construction that statutes that are *in pari materia* may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject." *In pari materia*, Black's Law Dictionary (11th ed. 2019). To give meaning to every word of § 17-33 and harmonize the apparent conflict between § 17-33(2) and § 17-4(2) in light of the legislative intent expressed in § 17-33(2), we hold that § 17-33(2) provides an exception to the general rule provided by § 17-4(2). We note that this holding is implied by our holdings in *In re Stevens*, *Hoffman*, and *Leach*—and, indeed, is required by our Court's controlling precedent on this question—but we make it expressly here.

## C. The Trial Court's Summary Denial of the Petition for Habeas Corpus in The Present Case

¶ 50    In the present case, the trial court ordered in relevant part as follows:

Petitioner has a long history of respiratory illness, which includes coughing up blood and extreme difficulty breathing. Furthermore, he was treated for bronchitis in May 2020 and pleurisy of the lungs on June 10, 2020. Petitioner is housed at Harnett Correctional Institute. On June 6, 2020, Harnett Correctional Institute had an inmate with a positive test for COVID-19. Petitioner argues that "some act, omission, or event, which has taken place afterwards, the party has become entitled to be discharged."

. . .

A petition for a writ of habeas corpus shall be denied where a person is held pursuant to a valid final judgment in a criminal case entered by a court with proper jurisdiction. N.C. Gen. Stat. § 17-4(2) (2019). Upon review of the judgments presented attached to this petition, these judgments are valid final judgments entered by a court with proper jurisdiction.

Pursuant to N.C. Gen. Stat. § 17-4(2), the Court concludes as a matter of law that the Defendant is confined by virtue of valid final judgments entered by a court of competent jurisdiction. Therefore, Defendant's application/petition for writ of habeas corpus is summarily denied.

The order under review is thus more detailed than required under our holdings in *Leach*. We repeat these holdings in relevant part here:

(1)     the decision concerning whether an application for a writ of habeas corpus should be summarily denied is a pure question of law;

(2)     a trial judge need not make findings of fact when the question before the court is purely legal in nature;

(3)     we review whether an application for a writ of

habeas corpus should be summarily denied using a *de novo*
standard of review; and

(4)     a petitioner for habeas corpus must provide us with
sufficient information to establish the accuracy of the
factual predicate underlying the challenge to the trial
court's order.

*See* 227 N.C. App. at 406-07, 414, 742 S.E.2d at 613, 618.

¶ 52      In this case, though the trial court entered a reasoned order articulating a
rationale for the denial of the petition, doing so was not required, and our review of
the trial court's decision is *de novo*.  Accordingly, as in *Leach*, whether we affirm or
reverse the order does not depend on whether we agree on appeal that the trial court
cited the correct legal basis for summary denial of the petition.  We now turn to
whether the trial court erred on the merits.

## D. The Necessity of Conducting an Evidentiary Hearing Based on the Allegations in the Petition and Accompanying Materials

¶ 53      The question on the merits is whether the application provided a "*colorable
basis* for concluding that [Petitioner's] claim to have a protected liberty interest in his
release from confinement . . . ha[d] merit." *Id.* at 411-12, 742 S.E.2d at 616 (emphasis
added).  We conclude that it did not.  As in *Leach*, Petitioner in this case failed to
make a threshold showing of a forecast of admissible evidence that was individualized
to the circumstances of *his* case that there was a material issue of fact as to whether
an "act, omission, or event" had occurred entitling him to discharge.  *See id.* at 411-
12, 742 S.E.2d at 616.  We therefore affirm the order of the trial court, though for a

different reason than the one provided in the trial court's order, N.C. Gen. Stat. § 17-4(2).

¶ 54    Petitioner alleged in his application that his imprisonment at the Harnett Correctional Institution violated the Eighth Amendment to the United States Constitution and Article I, § 27 of the North Carolina Constitution. Petitioner alleged in relevant part as follows:

> [U]pon information and belief, [Petitioner] has a long history of respiratory illness and is currently coughing up blood, has had extreme difficulty breathing over the last several months, was treated for bronchitis in May 2020 with prednisone and antibiotics, on June 10[,] 2020 was diagnosed and treated with pleurisy of the lungs, has been given a second round of antibiotics to be taken over 21 days, an inhaler with prednisone, and continuing breathing treatments.
>
> . . .
>
> On June []6, 2020, the Harnett Correctional Institute, although still unreported on the [] DPS website, had an inmate with a positive test for COVID-19. [] DPS will not conduct mass testing at a facility and will only conduct tests upon those individuals who show symptoms. Since June []6, the L dorm, which has 4 pods, where the inmate who tested positive [lives], is in complete lockdown. Furthermore, Harnett County and [] DPS make much ado of Power Breather Machines, yet those machines were removed from Harnett Correctional on June []3, 2020.
>
> Despite the measures taken to date by . . . DPS and Harnett Correctional, and not having any previous positive cases, it is clear that the facility is incapable of ensuring that [Petitioner] not be exposed to COVID-19. [] DPS's safety measures have been in place for over two months at

the Harnett Correctional Institution and still an inmate
was exposed to and contracted COVID-19 and displayed
symptoms. Much can be said of other inmates who may be
asymptomatic and pose a serious risk of harm to
[Petitioner]. [Petitioner's] physical condition places him at
extreme risk of death should he contract the respiratory
illness COVID-19.

Furthermore, over the last several days North
Carolina has seen a surge in COVID-19 cases and the
[Centers for Disease Control ("CDC")] projects [an]
increase in deaths due to COVID-19.

. . .

The CDC has explicitly highlighted that jails and
detention centers are ideal environments for the spread of
contagious diseases. In an interim guidance issued on
March 23, 2020[,] the CDC stated: "Incarcerated/detained
persons live, work, eat, study, and recreate within
congregate environments, heightening the potential for
COVID-19 to spread once introduced."

. . .

[I]t is clear that due to [Petitioner's] medical history
and condition, [] DPS's continued actions that directly
place [Petitioner] in harm's way, DPS's inability to protect
[Petitioner] from contracting COVID-19, and the very
serious risk of death for [Petitioner], that [Petitioner's]
continued confinement is both "cruel and unusual" and
"cruel or unusual" under the Eighth Amendment to the
[United States] Constitution and Article 1, § 27 of the
North Carolina Constitution, respectively.

(Citations omitted.)

In support of his allegations regarding his "extreme risk of death . . . [from]

COVID-19[,]" Petitioner submitted voluminous materials. These materials included

an affidavit by himself, an affidavit by his wife, letters he had written while incarcerated containing contemporaneous notes about his medical treatment and symptoms, data from the CDC's website and from DPS's website about COVID-19, the declarations of several expert witnesses filed in litigation related to COVID-19 and prison conditions in federal court in other states, and his medical records from his time in the custody of DPS. Notably absent from these materials was any affidavit, declaration, or other report of any kind of an expert Petitioner had retained to offer an opinion or testify about Petitioner's elevated risk of severe illness or other medical complications from COVID-19 based on an examination of Petitioner or review of his medical records. Nor did Petitioner provide any medical records in support of his petition that predated his time in the custody of DPS that documented the diagnosis, treatment, and severity of the medical conditions from which he allegedly suffers.

¶ 56        Instead, aside from the affidavits by himself and his wife and his DPS medical records, the materials submitted in support of Petitioner's allegations—like many of the allegations themselves—all generally concerned the dangers of COVID-19 in congregate living conditions such as prisons and data about COVID-19 cases in North Carolina's prisons. General information such as this could have supported similar claims raised by *any* prisoner in DPS custody experiencing medical conditions or other COVID-19 comorbidities. Although this information supported many of the

allegations in the petition, absent from the materials submitted in support of the petition was an evidentiary link between the general dangers of COVID-19 in congregate living conditions like prisons and the specific medical conditions from which Petitioner allegedly suffers.

¶ 57    The absence of an evidentiary link between the general information in the application and the specific circumstances of Petitioner's medical conditions—aside from the affidavits by Petitioner and his wife—left an evidentiary gap in the materials submitted in support of the petition that we hold was fatal to Petitioner's ability to demonstrate in the application that there was a "colorable basis for concluding that [Petitioner's] claim[s] . . . ha[d] merit." *Leach*, 227 N.C. App. at 412, 742 S.E.2d at 616.  Simply put, the materials submitted in support of the petition did not show how Petitioner's medical conditions put *him* at an elevated risk for serious illness or other medical complications from COVID-19, much less an "extreme risk of death . . . [from] COVID-19."

¶ 58    In his affidavit, Petitioner averred in relevant part as follows:

> 6.    There are over 600 inmates here at Harnett Correctional Institution.  Many are sick, coughing, and sick calls are taking up to 6 weeks to be seen.
>
> 7.    I was diagnosed with asthma prior to becoming incarcerated and I have an albuterol inhaler to this date in Harnett Correctional Institution.
>
> 8.    There are no masks, gloves, or sanitizer, and our

beds are less than 3 feet apart. There is black mold from the walls to the ceilings.

9.    As the pandemic COVID-19 is rapidly spreading in the other prisons near Harnett Correctional Institution, some of our correctional officers have been working at the Neuse Prison for the last week, and their cases have jumped from 80 to almost 300.

10.    There hasn't been any COVID-19 testing done here at Harnett Correctional Institution yet, and I fear for my life as the COVID-19 begins to spread closer and closer to us here.

11.    With me having asthma, I fear for my life that I will die in here once the COVID-19 spreads in here, as more and more inmates are getting sick.

Though this affidavit was not dated, as the trial court's order reflects, by the time the petition was filed on 15 June 2020, some COVID-19 testing had been conducted at Harnett Correctional Institute, detecting a positive case on 6 June 2020.

¶ 59    Petitioner's wife averred in her affidavit in relevant part as follows:

3.    [Petitioner] has asthma and throughout the 16+ years I've known him and have lived with him, I have witnessed his asthma and respiratory conditions worsening as he gets older.

4.    [Petitioner] has been a carpenter for 23 years and has been exposed to asbestos due to the renovation of approximately 27 historic homes.

5.    [Petitioner] has also been exposed to a lot of black mold due to the repairing of a little over 100 storm, flood, and hurricane-damaged homes. These exposures to asbestos and black mold were over a 17 to 19 year span and his respiratory health declined.

6.     [Petitioner] also served as a firefighter for the Turkey Fire Department and was exposed to severe smoke inhalation for a couple of years.

7.     Prior to [Petitioner] losing his trial and being incarcerated, he has had a rescue inhaler prescription with an expiration date of February 2020 (RX 6446327).  He has a nebulizer (breathing treatment) and Albuterol medications to be used as needed daily.  [Petitioner] has been on and off prednisone and antibiotics due to his lungs developing respiratory infections, frequent bronchitis, and asthma have all worsened with age.

8.     As his wife, I have witnessed his breathing and asthma worsening.  Smokey, not well ventilated, hot, and moldy prison environments increase the severity of his health conditions with his labored breathing, comprised [sic] lungs, asthma, respiratory infections, and frequent bronchitis.

. . .

10.     The deadly COVID-19 virus is now in the prisons and Harnett Correctional Facility where my husband currently lives.

11.     I fear that with [Petitioner's] medical history prior to being incarcerated and with his current health conditions declining, vulnerability of his lungs, worsening of his asthma, and respiratory infections, that if he contracts this deadly COVID-19 virus, his chances of losing his life are so much greater due to this environment.

12.     His immune system is not strong enough to combat this virus successfully.

. . .

15.     Harnett Correctional Institution's environment, like all of the other prisons, is not safe for [Petitioner's] well-

being due to him being at a higher risk due to his asthma and the conditions of his lungs and breathing.

16.     Most importantly, if he were to contract the deadly COVID-19 virus that is now present in Harnett Correctional Institution (and the other prisons) he would more likely succumb to the virus's wrath.

17.     With the prison facilities' environment – smoke-filled air, lack of ventilation and air conditioning, black mold, beds less than 3ft [sic] apart, and COVID-19 present now – [Petitioner] would most likely not survive if he is exposed to the virus.

A review of these affidavits discloses an evidentiary forecast of four important facts to which Petitioner and his wife could have testified at an evidentiary hearing: (1) Petitioner had been diagnosed with asthma and other respiratory illness and had been prescribed medication for these conditions; (2) Petitioner was imprisoned at Harnett Correctional Institution, where there was no known COVID-19 outbreak but outbreak was certainly possible and perhaps likely because of conditions at the prison; (3) Petitioner had been engaged in vocational activities prior to his imprisonment that worsened his respiratory illness as he aged; and (4) perhaps most predominantly, Petitioner and his wife feared for his life while he was incarcerated during a pandemic in conditions rendering many precautionary measures recommended for minimizing the risk of COVID-19 impossible for Petitioner, like so many other prisoners confined in jails and prisons in North Carolina.

Generally speaking, "[e]very person is competent to be a witness[.]" N.C. Gen.

Stat. § 8C-1, Rule 601(a) (2019). Petitioner and his wife certainly could testify as fact witnesses under the limits of Rule 602 of the North Carolina Rules of Evidence regarding their knowledge of Petitioner's medical history and the severity of the symptoms of his asthma and other respiratory illness and any medications he had taken or other treatment he had received. *See id.*, Rule 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter."). However, based on the record before us, neither are possessed of expert qualifications on averments in their affidavits important to bridge the gap between the individual circumstances of Petitioner's case and *his* medical conditions and the general information in the application about the dangers of COVID-19 to people with respiratory conditions and the increased risk of COVID-19 in prison.[9]

---

[9] Rule 702 of the North Carolina Rules of Evidence sets forth the following general standard for the admissibility of expert testimony:

> (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
>
> > (1) The testimony is based upon sufficient facts or data.
> >
> > (2) The testimony is the product of reliable principles and methods.

¶ 62        We do not mean to suggest that we doubt the sincerity or question in any way the legitimacy of Petitioner and his wife's fears for his life while imprisoned during a pandemic. We do, however, conclude that the averments in the affidavits by Petitioner and his wife and the other materials submitted in support of the petition fail to demonstrate that any testimony Petitioner or his wife might offer about his prognosis and increased risk of serious illness or complications from COVID-19 because of his health conditions would be admissible expert testimony under Rule 702. Nor would these averments qualify as admissible lay opinion testimony under Rule 701, which limits the admissibility of lay witness testimony "in the form of opinions or inferences . . . to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." *Id.*, Rule 701 (2019). While "a lay witness may give an opinion concerning the state of a person's health[,]" *State v. Galloway*, 304 N.C. 485, 491, 284 S.E.2d 509, 514 (1981) (citation omitted), only an expert can give competent evidence of "complicated medical questions far removed from the ordinary experience and knowledge of laymen," *Click v. Pilot Freight*

---

(3) The witness has applied the principles and methods
reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702 (2019). The record does not contain any indication that Petitioner or his wife meet the general standard provided by Rule 702 for admissible expert testimony related to Petitioner's prognosis while in prison and his increased risk of serious illness or complications from COVID-19 because of his medical conditions.

*Carriers, Inc.*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). The averments related to Petitioner's heightened probability of severe illness or complications from COVID-19 belong to the latter category.

¶ 63    All that is left to bridge the evidentiary gap we have identified as the fatal defect in Petitioner's application are his medical records while in the custody of DPS. We conclude that these medical records do not demonstrate what the prognosis for Petitioner's asthma and other respiratory illness in prison is or what the increased risk of serious illness or complications from COVID-19 to Petitioner would be. This is not particularly surprising based on the constraints under which the medical staff at the prison were working during the time the records were created and the role of these staff at the prison, which is not forensic. These records also document numerous medical visits while Petitioner was in prison when he denied having a history of past respiratory conditions, including denying that he had asthma.

¶ 64    In fact, based on these medical records, the first time DPS became aware of Petitioner's asthma and history of respiratory illness was when he was first diagnosed with mild intermittent asthma on 8 May 2020, once news of the pandemic was widespread. This detail, while not by itself dispositive, combined with the lack of individualized evidentiary support in the application, undermines Petitioner's credibility related to his averments and contemporaneous notes about the severity of his medical conditions in our assessment, as does the fact that all of his crimes involve

dishonesty.  Ordinarily, we do not make credibility assessments as an appellate court.  *See, e.g.*, *Headen v. Metro. Life Ins. Co.*, 206 N.C. 860, 862, 175 S.E. 282, 283 (1934) ("It is not a matter for review on appeal that the jury declined to believe the evidence of one of the parties, or that the trial court refused to set aside the verdict as against the weight of the evidence.").  However, on *de novo* review of a pure question of law, we must consider what weight the trial court should have given the evidentiary support in the application.  *See* N.C. Gen. Stat. § 17-32 (2019) (requiring an evidentiary hearing only where "issue be taken upon the material facts in the return, or other facts are alleged to show that the imprisonment or detention is illegal, or that the party imprisoned is entitled to his discharge").  As far as Petitioner's medical records while in the custody of DPS are concerned, we conclude that these records do not provide a "colorable basis for concluding that [Petitioner's] claim[s] . . . ha[d] merit." *Leach*, 227 N.C. App. at 411, 742 S.E.2d at 616.

¶ 65         In sum, the application did not show how Petitioner's medical conditions put him at an elevated risk for serious illness or other complications from COVID-19.  The absence of an evidentiary link between the general information in the application and the specific facts of Petitioner's case was fatal to Petitioner's ability to make a threshold showing that there was a material issue of fact as to whether an "act, omission, or event" had occurred entitling him to discharge.  No hearing under § 17-32 was therefore required.  Accordingly, we affirm the trial court's summary denial

of the petition.

## VI.     Conclusion

We affirm the order of the trial court because the application for habeas corpus did not demonstrate that Petitioner had colorable claims for violations of his rights to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and cruel or unusual punishment under Article 1, § 27 of the North Carolina Constitution.

AFFIRMED.

Judges COLLINS and GORE concur.